## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division

| | | |
|---|---|---|
| **TIMEPAYMENT CORP.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Case No. 9:25-cv-80386 |
| | ) | |
| **ADVANCED GLOBAL GROUP LLC,** | ) | |
| **JOSE C. ISLA, and** | ) | |
| **ISLANDS ENTERPRISES LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

TimePayment Corp. ("TimePayment"), by counsel, serves the following as its Verified Complaint against Advanced Global Group LLC ("Advanced"), Jose C. Isla ("Isla"), and Islands Enterprises LLC ("Islands Enterprises") (collectively, "Defendants" or "RICO Enterprise"). TimePayment states as follows in support of its claims against the Defendants.

## INTRODUCTION

1.      TimePayment provides lease financing to customers looking to secure equipment for their businesses. It arranges that financing through approved equipment vendors. Until recently, Advanced was one of TimePayment's approved vendors.

2.      Advanced sells equipment and merchant services to small business customers. Isla is its owner, President, and salesman. He has direct contact with Advanced business customers and helps apply for and secure financing for equipment on their behalf. Advanced's arrangement with TimePayment was supposed to work as follows.

3.      If Advanced identified a business interested in its equipment but in need of financing, the customer would complete a lease application and Advanced would submit the application for an equipment lease between the customer and TimePayment. That lease application

included customary credit information, personal information about the customer, and details on the equipment to be subject to the lease.

4.      If TimePayment approved the lease application, Advanced was responsible for arranging the customer's signature on the lease and perhaps most importantly, the customer's bank account information on the method of payment form. Advanced would then submit the signed lease and an invoice for the equipment subject to the lease to TimePayment. In turn, TimePayment would pay Advanced a lump sum and take title to the subject equipment.

5.      At that point, TimePayment would have a binding lease with Advanced's customer (the "Lessee") and would make monthly withdrawals of lease payments from the Lessee's bank account that the customer provided and Advanced submitted in the initial Lease Application. That is how the arrangement was *supposed* to work.

6.      In reality, Isla, Advanced, and another Isla-controlled company, Island Enterprises, combined in a pattern of racketeering activity beginning in November 2022 and continuing until at least May 2024. That activity included predicate acts under Federal and Florida Racketeering Influenced and Corrupt Organizations Acts ("RICO"), including mail fraud, wire fraud, money laundering, and various violations of Florida criminal statutes.

7.      Isla acted as Advanced's salesman and repeatedly misled customers into providing their personal and bank information, which he needed to complete lease applications that Advanced then submitted to TimePayment. Isla falsely told some that the equipment was free. He falsely told others that the lease was not binding or was cancelable at any time. In other cases, Isla, acting as Advanced's salesman and representative, received a customer's consent to submit one lease, but submitted multiple leases in the customer's name.

8.       Unbeknownst to TimePayment until recently, Advanced's lease applications, leases, and equipment invoices to TimePayment—which Isla completed and Advanced submitted—were riddled with false information. They identified different equipment than what Advanced delivered to the customer. Indeed, on some occasions, Advanced submitted an invoice and lease for the equipment to TimePayment and received payment for the equipment from TimePayment but provided nothing at all to the customer. It also submitted multiple leases for customers who had not agreed to those multiple leases, or who had not agreed to any leases at all.

9.       Most importantly, Isla and Advanced repeatedly listed bank accounts as the payment source on leases that they knew were not tied to the business named on the lease. As detailed below, this was part of a bank account shell game that the RICO Enterprise used to perpetrate and conceal its illegal activities. Islands Enterprises was a crucial part of this bank account shell game, as explained below.

10.      None of this was by accident or mistake. By increasing the number of leases, Isla increased the amount of equipment payments Advanced could squeeze from TimePayment. Upon information and belief, Isla then caused Advanced to transfer some or all of these ill-gotten profits to Islands Enterprises, and potentially to other entities associated with Isla.

11.      Some of Advanced's customers began to realize that Isla had signed them up for leases with TimePayment that they never agreed to once TimePayment began withdrawing money from their accounts. When they complained to Isla, he attempted to mollify them by making hush money payments for their silence. TimePayment has evidence that Isla used Islands Enterprises to make at least one of these hush money payments. It has reason to believe that Isla and Islands Enterprises made many more.

3

12.     Between November 2022 and May 2024, TimePayment paid Advanced over $2.5 million for equipment subject to 392 leases originated by Advanced. However, TimePayment has now discovered that at least 314 of those leases were fraudulent. As described above and detailed below, those fraudulent leases were obtained and maintained through a pattern of racketeering activity.

13.     TimePayment paid Advanced at least $2,138,701.00 in connection with those 314 fraudulent Leases. It now seeks damages under the Federal and Florida RICO Acts and equitable and injunctive relief under the Florida RICO Act, from Defendants.

## PARTIES

14.     TimePayment is a Delaware corporation with its principal place of business at 200 Summit Drive, Suite 100, Burlington, Massachusetts 01803.

15.     Jose C. Isla is a resident of Boca Raton, Florida. At the time periods relevant to the claims in this Complaint, he was the President of Advanced and the managing member and registered agent of Islands Enterprises.

16.     Advanced Global Group LLC is a Florida limited liability company with its principal place of business at 7777 Glades Road, Suite 100, Boca Raton, Florida 33434. Isla is the president of Advanced and the mastermind of the RICO Enterprise.

17.     Islands Enterprises LLC was a Florida limited liability company with its principal place of business at 12717 West Sunrise Boulevard, Suite 127, Sunrise, Florida 33323. Isla was Islands Enterprises' managing member and registered agent. Islands Enterprises was administratively dissolved on September 27, 2024.

## JURISDICTION AND VENUE

18.     Because TimePayment brings a claim under the federal Racketeering Influenced and Corrupt Organization Act ("RICO") (18 U.S.C. § 1961, *et seq*.), this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

19.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between TimePayment and the Defendants, and the amount in controversy exceeds $75,000.00.

20.     This Court has supplemental jurisdiction over the Florida RICO Act claims (Counts III and IV) and the unjust enrichment claim (Count V) pursuant to 28 U.S.C. § 1367, because those claims arise from the same transactions and occurrences and are part of the same controversy as the Federal RICO Act claims (Counts I and II).

21.     This Court has personal jurisdiction over the Defendants because each is domiciled in Florida and regularly conducts (or conducted) business here.

22.     A substantial part of the events giving rise to TimePayment's claims occurred in this judicial district. Accordingly, venue is proper in this judicial district under 28 U.S.C. § 1391(b). Venue is also proper under 18 U.S.C. § 1965(a).

## STATEMENT OF FACTS

### TIMEPAYMENT'S TYPICAL LEASE ARRANGEMENT

23.     TimePayment offers lease financing to businesses seeking commercial equipment.

24.     TimePayment enters into agreements with companies that sell or provide such equipment to business customers ("Vendors"). The arrangement works as follows.

25.     A Vendor identifies a customer in need of financing for the equipment it sells and submits an application for lease credit to TimePayment on that customer's behalf or provides the customer with the contact information to submit their own application.

26.     Per its agreements with TimePayment, a Vendor makes several warranties concerning the applications and other materials it submits to TimePayment. Among other things, the Vendor warrants:

- The lease is properly signed by the authorized party for the entity who will be bound by the lease (i.e., the Lessee);

- That the signatory has the authority to bind the Lessee to the lease;

- That the Vendor has not loaned, rebated, or advanced to the Lessee any of the funds necessary to commence the lease;

- That the Lease accurately reflects the equipment subject to the lease and that Vendor is transferring marketable title of the equipment to TimePayment;

- That the Vendor will not participate in or exert influence over TimePayment's telephone verification efforts (i.e., due diligence) with the Lessee and Vendor has not agreed to any modification of the lease terms;

- That the Vendor has not made any promises or representations to the lease that are not contained in, or that contradict, the terms of the lease; and

- That the transaction is free of fraud, forgery, or misrepresentation.

27.     If TimePayment approves the lease, the Vendor is responsible for arranging the customer's signature on the lease and perhaps most importantly, providing the customer's bank account information on a method of payment form. That bank account becomes the payment source from which TimePayment will draw monthly lease payments. The Vendor also submits an invoice for the equipment subject to the lease. TimePayment pays that invoice (usually in a lump sum payment) and takes title to the equipment subject to the lease.

28.     Once TimePayment approves the lease and takes title to the equipment, the lease becomes a non-cancellable, binding lease between it and the Vendor's customer (i.e., the Lessee) under Article 2A of the Uniform Commercial Code.

29.     Thereafter, TimePayment collects monthly lease payments from the Lessee through ACH withdrawals from the bank account (i.e., the payment source) that the vendor provided for the Lessee.

30.     This is a mutually beneficial arrangement for the Vendor, TimePayment, and the Lessee. TimePayment assumes the risk of non-payment on the lease and purchases the equipment from the Vendor. Because TimePayment offers financing for the Vendor's customers, the Vendor can expand the pool of customers for its equipment. In turn, more Lessees can secure the equipment they need for their businesses. Finally, TimePayment receives the benefit of the monthly payments from the Lessee.

31.     The chart below summarizes the typical lease origination transaction between TimePayment, a Vendor, and a Lessee:



32.     Generally, the Vendor is the point of contact with the customer and controls the flow of the information from that customer to TimePayment. TimePayment then uses that

information to assess the lease application for that customer. Thus, TimePayment relies on the integrity of its Vendors.

33.     TimePayment secures representations and warranties from its Vendors to provide accurate information about potential Lessees (as discussed above) and the equipment subject to the potential lease.

### THE RICO ENTERPRISE: ITS MEMBERS AND THEIR COMMON GOALS

34.     Advanced is a merchant service company that provides point-of-sale payment processors, ATMs, and similar equipment to various types of businesses across the country. At all times relevant to this Complaint, Isla served as Advanced's President.

35.     Between 2018 and September 27, 2024, Isla also served as the owner, managing member, and registered agent for Islands Enterprises.

36.     In 2022, Isla approached TimePayment about signing a Vendor Agreement between Advanced and TimePayment. The parties did so on October 14, 2022.[1]

37.     Between November 2022 and May 2024, Advanced submitted, and TimePayment approved 392 leases for Advanced's customers.

38.     However, as described more below, TimePayment's pre-suit investigation has concluded that 80% of those leases (314 of 392) were obtained and/or maintained by fraud and other illegal acts perpetrated by Isla, Advanced, and Islands Enterprises.

39.     While these three Defendants were distinct, they associated to conduct a pattern of racketeering activity aimed at achieving several common goals.

---

[1] Advanced submitted ACH authorizations to TimePayment for two of Advanced's accounts, one at Regions Bank and another at New York Community Bank (now known as Flagstar). *See* **Exhibits 1 and 2**, respectively.

40.     **Acquire Customers' Personal and Bank Account Information:** The RICO Enterprise, through Isla as its point man, deceived customers with various misrepresentations about the use of Advanced's commercial equipment in order to obtain the customers' personal information (including bank account information) necessary to submit leases to TimePayment.

41.     **Submit Fraudulent Leases and Invoices to TimePayment:** The RICO Enterprise, through fraudulent lease applications, leases, and equipment invoices drafted by Isla and submitted by Advanced, originated at least 314 fraudulent leases for Advanced's customers.

42.     **Maximize Equipment Payments from TimePayment:** By increasing the number of leases it originated, Advanced increased the amount of equipment payments it received from TimePayment. It received over $2.5 million in equipment payments from TimePayment for the 392 leases it originated between November 2022 and May 2024. TimePayment has now determined that at least 314 of those leases (representing at least $2,138,701.00 in equipment payments from TimePayment) were the product of fraud.

43.     **Conceal the Enterprise's Illegal Acts and Launder Illicit Profits Through a Bank Account Shell Game:** The RICO Enterprise—through Isla as the mastermind and with the help of his associated entities Advanced and Islands Enterprises—acted to conceal its fraud by executing the bank account shell game described below. The point of this shell game was to help maximize the number of leases Advanced could originate, limit the risk that someone would discover the fraud, and hide the proceeds of the illegal Enterprise.

44.     **Silence Victims Through Hush Money Payments:** The RICO Enterprise, directed by Isla and through Islands Enterprises and possibly others, used the illicit profits to pay off victims of the fraudulent leases in order to keep them quiet.

## THE RICO ENTERPRISE'S ILLEGAL ACTS

### MISREPRESENTATIONS, FRAUDULENT LEASES, AND HUSH MONEY PAYMENTS

45.     During the relevant time period, Isla was the President of Advanced and the managing member of Islands Enterprises. He used his position at both entities to draw them into the RICO Enterprise.

46.     Isla interacted with business owners and sought to solicit them to use Advanced's equipment in their businesses.

47.     Unbeknownst to TimePayment at the time, Isla made various false representations to Advanced's customers to obtain their personal and bank account information—which he needed to complete the lease materials that Advanced would submit to TimePayment.

48.     TimePayment became aware of these misrepresentations slowly as businesses began filing fraud complaints, claiming that TimePayment was charging them for leases they had never agreed to.

49.     Through fielding those complaints and speaking with customers, TimePayment learned that Isla offered a panoply of lies to induce businesses into handing over their information (particularly their bank account information) to Advanced. Isla made the misrepresentations below to multiple businesses between November 2022 and May 2024.

50.     He told some customers that Advanced's equipment was free and offered to pay them to place it in their stores. This was not charity. It was a ploy to get the customers' information. Isla used that information to fill out fraudulent lease materials for Advanced to send to TimePayment. These customers were unaware that Advanced had submitted leases on their behalf. They were understandably confused when TimePayment began withdrawing money from their bank accounts to cover monthly payments for leases the customers were completely unaware of.

51.     In other cases, Isla revealed that the customers would lease Advanced's equipment through a lease with TimePayment. However, on numerous occasions, Advanced submitted multiple leases for customers who had not agreed to be bound by multiple leases.

52.     In other instances, Isla failed to deliver the equipment subject to the lease. In still others, he promised the customer one piece of equipment but caused Advanced to invoice TimePayment for a different piece of equipment. Upon information and belief, this was to secure payment for equipment that was not on TimePayment's approved list. In other words, Isla would promise a customer delivery of equipment he knew was not on TimePayment's approved list, but Advanced would invoice TimePayment for equipment that was in order to secure the lease and the equipment payment.

53.     Slowly, businesses began complaining to TimePayment when TimePayment withdrew monthly lease payments from their accounts.

54.     Some had no idea they were bound by any lease at all.

55.     Others were shocked to learn that Advanced had submitted multiple (unauthorized) leases in their name.

56.     Others denied signing a lease and said that the leases Advanced submitted on their behalf were forged.

57.     Still others learned that their bank accounts were listed as the payment source on leases for other (unrelated) businesses.

58.     By February 2025, TimePayment had charged off nearly 15% of the leases originated by Advanced, some of which were due to the fraud complaints mentioned above.

59.     As TimePayment began taking a closer look at the leases Advanced originated in February 2025, it discovered that 71% of those leases were 30 days or more overdue. Most of the

bank accounts listed as the payment source on those leases report insufficient funds. This delinquency figure is drastically above TimePayment's average delinquency rate of 15%. This triggered an internal investigation into all 392 Leases Advanced originated between November 2022 and May 2024.

60.     TimePayment reviewed each lease application and lease, consulted any communications it had received from the Lessees or Advanced, examined bank accounts listed on each lease, and analyzed payment history from the bank accounts listed as the payment source for the lease to identify any suspicious trends, such as whether delinquencies were coordinated between bank accounts listed on multiple leases.

61.     TimePayment also utilized a financial verification system to authenticate the creditworthiness and legitimacy of bank accounts listed as the payment source on the 392 leases originated by Advanced.[2]

62.     That software conducts a two-pronged analysis, assessing (1) whether the bank account listed as the payment source on a Lease Application is associated with the Lessee named on the Lease; and (2) whether the bank account is valid and properly funded. The results were striking.

63.     297 of the 392 Leases originated by Advanced (over 75%) either failed or were flagged as a risk to fail at least one of the two search criteria. Put another way, less than a quarter of the Leases passed both tests.

64.     Using the software's query function, TimePayment then analyzed whether any of the 392 leases originated by Advanced listed a bank account associated with Isla, Advanced, or

---

[2] TimePayment uses this software as part of its suite of tools in conducting due diligence efforts on bank accounts that Vendors submit for their own payment.

Islands Enterprises—an entity TimePayment had only recently discovered was associated with Isla. Again, the results were shocking.

65.     99 of the 392 Leases originated by Advanced (25%) listed a bank account tied to Island Enterprises. In short, over a quarter of all leases that Isla submitted to TimePayment listed a bank account that he, not the Lessee, controlled. We discuss this in more detail below.

66.     Through its pre-suit investigation, TimePayment has concluded that 314 of the 392 leases originated by Advanced (80%) are fraudulent in one or more of the following ways.

67.     **The Lease was Procured by Fraud, Forgery, and/or Misrepresentation:** Many of the 314 leases were procured by fraud, forgery, or a material misrepresentation made by Isla to the business owner.[3]

68.     **The Lease Lists a Bank Account That Is Listed as the Payment Source on Leases for Other Unrelated Businesses:** Many of the 314 fraudulent leases listed a bank account as a payment source that is also listed on other leases for other unrelated businesses. As discussed more below, this was part of the bank account shell game that the RICO Enterprise used to perpetrate and conceal its fraud. In some instances, the bank accounts belonged to other victim businesses. On other occasions, the bank accounts actually belonged to Islands Enterprises. On still other occasions, the bank accounts appear to be associated with, or otherwise controlled by, the members of the RICO Enterprise.

69.     **The Lease Lists a Bank Account that Failed the Software Analysis:** Several leases listed a bank account that—while not used on other leases for other businesses—was not associated with the business named on the lease.

_____

[3] TimePayment learned about these misrepresentations from the business owners themselves when they made fraud complaints to TimePayment.

70.    **The Lease is for a Business Bound by Multiple Unauthorized Leases:** Several more leases were for businesses that were bound by more than one lease and did not agree to be so bound.

71.    The software data revealed the scope and pattern of fraud perpetrated by the RICO Enterprise and, in particular, their complicated use of bank accounts to perpetrate their illegal acts.

THE BANK ACCOUNT SHELL GAME

72.    The 392 leases Advanced originated listed 498 different bank accounts as payment sources. While some of those accounts were legitimately tied to a Lessee, many were not. Even for those that were legitimate, the RICO Enterprise used some of them in illegal ways.

73.    The RICO Enterprise—led by Isla and assisted by Advanced and Islands Enterprises—utilized both legitimate and illegitimate bank accounts to create a complex shell game, the goal of which was to conceal their illegal activities and allow them to continue those activities unabated.

74.    For example, Advanced listed a small universe of bank accounts as the payment source on numerous leases for different businesses. This allowed Advanced to secure multiple leases for multiple businesses but cause a smaller number of other businesses to incur the monthly lease charges.

75.    For example, Advanced originated 8 leases for one business, a beauty salon in West Palm Beach. The business owner was not aware of any of those leases for some time. She later told TimePayment that Isla had told her that Advanced would pay her business to use Advanced's equipment. However, Advanced submitted multiple unauthorized leases to TimePayment on the salon's behalf. It listed the same bank account as the payment source on all eight leases: a Bank of America ("BoA") account ending in -2946.

76.     Eventually the salon owner uncovered the fraud and spoke with TimePayment. When TimePayment told her about the BoA account listed on the 8 leases, she informed TimePayment that the salon did not even have a bank account with BoA. Not only had Advanced submitted numerous unauthorized leases on the salon's behalf, but it had listed a bank account on those leases that was not owned by the salon. This was not an anomaly. It was part of the RICO Enterprise's pattern to commission and conceal its fraud.

77.     Indeed, TimePayment discovered that the salon was not the only business that Advanced tied to that same BoA account. It listed that account as the payment source on 20 leases for 3 apparently unaffiliated entities: the beauty salon in West Palm Beach (8 Leases), a bakery in Orlando (9 Leases), and a variety store in North Miami (3 Leases).

78.     Advanced repeated this pattern with numerous bank accounts and businesses. We provide only a few illustrative examples below.

79.     It listed another BoA account ending in -4199 as the payment source on 25 Leases for 6 apparently unrelated entities. These included: a variety store in Miami (4 Leases), a market in Fort Lauderdale (1 Lease), a bakery and restaurant in Miami (1 Lease), a Haitian restaurant in Miramar (13 Leases), a transportation company in Bradenton (5 leases), and a salon and barbershop in Miami (1 Lease).

80.     It listed another BoA account ending in -7042 as the payment source on 22 leases for 3 apparently unrelated entities. These included a shipping and logistics company in North Miami (12 leases), a fashion and alteration shop in Fort Lauderdale (5 leases), and a company in Lauderdale Lakes (5 leases).

81.     It listed another BoA account ending in -9659 as the payment source on 13 leases for 3 apparently unrelated entities. These included a liquor store in Tamarac (9 leases), a wireless store in North Miami (3 leases), and a Caribbean food shop in Pine Hills (1 lease).

82.     It listed another BoA account ending in -8489 as the payment source on 12 Leases for 3 apparently unrelated entities. These included a Haitian restaurant in Miami (7 leases), a Guatemalan restaurant in Bradenton (4 leases), and a multiservices company in Miami (1 lease).

83.     It listed another BoA account ending in -6343 as the payment source on 9 leases for 5 apparently unrelated businesses. These included: a barbershop in Lauderdale Lakes (4 leases), a grocery store in Bradenton, (2 leases), a variety store in North Miami (1 lease), a bakery in Lauderhill (1 lease), and a company in Everett, Massachusetts (1 lease).

84.     It did the same with a Regions Bank account ending in -2140. It listed that bank account as the payment source on 5 leases for 3 apparently unrelated entities. These included: a Haitian restaurant in Miami (3 leases), a halal meat market in the Bronx, New York (1 lease), and an investment company in Lake Park, Florida (1 lease).

85.     Again, these are just a few illustrative examples. TimePayment identifies all of the known bank accounts involved in the RICO Enterprise's bank shell game in the next section below.

86.     Upon information and belief, this shell game was part of a strategy. TimePayment withdrew these lease payments on a monthly basis. They were also relatively small, with the average monthly payment being $170.73. Therefore, these withdraws may go unnoticed for some time on even a diligent business owner's account. Any such delay afforded time for Advanced to collect the lump sum equipment payment from TimePayment for the equipment subject to the lease before anyone discovered the fraud.

87.     Isla and Advanced compounded the delay by regularly listing incorrect contact information for the Lessees on many of the leases. Thus, if a lease went into delinquency and TimePayment wanted to contact the Lessee listed on the lease, it might have trouble reaching the right person. This further delay gave Advanced time to collect the equipment payments before anyone discovered the fraud.

88.     Still, listing bank accounts for one business on leases for another ran the risk that someone would discover the fraud and blow the whistle. To avoid this, Isla and Advanced began to list bank accounts for entities under Isla's control as the payment source on the lease applications for Advanced's customers. One such entity was Islands Enterprises.

89.     As far as TimePayment is aware, in 2022, Advanced did not submit any leases identifying a bank account associated with Islands Enterprises as the payment source.

90.     However, beginning in 2023 and increasing through May 2024, Advanced listed accounts associated with Isla's entity, Islands Enterprises, as the payment source on leases for Advanced's customers. As with its other fraudulent lease applications, Advanced falsely passed these Islands Enterprises accounts off as being associated with the business named on the lease.[4]

91.     Advanced originated the first Lease listing an Islands Enterprises bank account in April 2023. It originated two more in May and July 2023, respectively.

92.     Upon information and belief, these were trial balloons to see if the Islands Enterprises accounts would get flagged as fraudulent. Once it was clear they would not, the RICO Enterprise shifted to using those accounts as a payment source on its fraudulent leases in earnest.

---

[4] During this period, TimePayment was still unaware of Islands Enterprises, let alone its connection to Isla.

93.     Between October 2023 and May 2024, Advanced originated at least 96 Leases that listed an Islands Enterprises bank account as a payment source.

94.     Upon information and belief, the RICO Enterprise—with Isla as its mastermind and Advanced and Islands Enterprises following his direction—deliberately made this shift to further conceal its illegal acts.

95.     Upon information and belief, the members of the RICO Enterprise realized that they could use Islands Enterprise to shield the Enterprise's activities from possible fraud complaints. Listing other businesses' bank accounts as the payment source on fraudulent leases ran the risk that those victims would discover the fraud and complain. If the RICO Enterprise could list the accounts of a pliant party that would make the small monthly Lease payments without complaint, it could continue the scheme unabated for the small price of the monthly lease payments. Enter Islands Enterprises—a member of the RICO Enterprise itself.

96.     Upon information and belief, the RICO Enterprise began listing Islands Enterprises' bank accounts on its fraudulent leases once it had obtained sufficient equipment payments from TimePayment to cover the small monthly lease payments for its fraudulent leases.

97.     Upon information and belief, the members of the RICO Enterprise determined that these small monthly lease payments were a worthwhile investment in the overall RICO Enterprise, because they insulated it from potential fraud complaints.

**THE ACCOUNTS IN THE SHELL GAME AND HOW THE RICO ENTERPRISE USED THEM**

98.     Based on its pre-suit investigation, TimePayment has identified 26 bank accounts ("Subject Accounts") that the RICO Enterprise utilized in some way to conduct or conceal its illegal acts through the bank account shell game. These Subject Accounts fall into four distinct sub-categories: "Advanced Accounts," "Islands Accounts," "Suspected Enterprise Accounts," and

"Victim Accounts." Each of these sub-categories are described below. With the exception of Victim Accounts, they are also categorized in a Table of Bank Accounts attached as **Exhibit 3**.

99.     **Advanced Accounts (2 bank accounts):** These are two bank accounts that Advanced identified on the ACH Authorization forms it submitted to TimePayment when it signed on as one of Advanced's vendors. *See* Exhs. 1 and 2. These accounts are tied directly to Advanced. They include:

- New York Community Bank account ending in -0306 ("NYCB-0306")
- Regions Bank account ending in -1407 ("RB-1407")

100.    Upon information and belief, the Advanced Accounts contain at least some of the proceeds of the RICO Enterprise's illegal acts.

101.    **Islands Accounts (6 bank accounts):** These are 6 Bank of America accounts tied to Islands Enterprises. As discussed above, in late 2023 and continuing into 2024, the RICO Enterprise began listing these Islands Accounts as the payment source for fraudulent leases it submitted to TimePayment. It submitted 99 such leases tied to 21 different customers between May 2024 and May 2024. The Islands Accounts include:

- BoA account ending in -1668 ("BoA-1668"): 14 leases with 6 customers
- BoA account ending in -4199 ("BoA-4199"): 25 leases with 6 customers
- BoA account ending in -4910 ("BoA-4910"): 12 leases with 2 customers
- BoA account ending in -4949 ("BoA-4949"): 13 leases with 1 customer
- BoA account ending in -7042 ("BoA-7042"): 22 leases with 3 customers
- BoA account ending in -7189 ("BoA-7189"): 13 leases with 3 customers

102.    Upon information and belief, Isla and/or Advanced transferred at least some of the RICO Enterprise's illegal acts to one or more of the Islands' Accounts.

103.     In addition to using the Islands Accounts as part of the bank account shell game, the RICO Enterprise also used Islands Enterprises to pay off the victims of the RICO Enterprise's illegal acts in the hopes of keeping them quiet.

104.     As noted above, when TimePayment began withdrawing money from their accounts, some of Advanced's customers contacted Isla complaining about fraud. Isla tried to mollify them with money. Several customers have averred to TimePayment that Isla paid them via the bank-to-bank transfer app, Zelle, for the amounts TimePayment withdrew from their accounts.

105.     Even at this early, pre-discovery stage of the case, TimePayment has an example of one such payment made from an Island Enterprises account to a complaining Advanced customer:[5]



106.     Upon information and belief, Islands Enterprises has made other such Zelle payments from one or more of the 6 Islands Accounts listed above using the proceeds from the RICO Enterprise's illegal actions.

---

[5] The handwriting on this screenshot is from the customer who sent the screenshot to TimePayment in connection with his fraud complaint.

107. **Suspected Enterprise Accounts (13 bank accounts):** These include 10 accounts with Bank of America and 3 accounts with Regions Bank. Advanced listed these accounts as the payment source on at least 102 leases for 38 different customers. The verification software described above concluded that these accounts are not tied to any of those customers. Like the Islands Accounts, Advanced spread these bank accounts across leases for multiple, seemingly unrelated businesses.

108. Given that the RICO Enterprise used the bank accounts in this manner and the accounts are not associated with the customers named on the leases on which they appear, TimePayment reasonably believes that these Suspected Enterprise Accounts are associated with or controlled by the RICO Enterprise.

109. The Suspected Enterprise Accounts include:

- BoA account ending in -2360 ("BoA-2360 "): 5 leases with 4 customers

- BoA account ending in -2464 ("BoA-2464"): 5 leases with 2 customers

- BoA account ending in -2946 ("BoA-2946"): 20 leases with 3 customers

- BoA account ending in -3290 ("BoA-3290"): 3 leases with 3 customers

- BoA account ending in -4381 ("BoA-4381"): 2 leases with 2 customers

- BoA account ending in -4404 ("BoA-4404"): 6 leases with 2 customers

- BoA account ending in -6343 ("BoA-6343"): 9 leases with 5 customers

- BoA account ending in -6862 ("BoA-6862"): 4 leases with 2 customers

- BoA account ending in -8489 ("BoA-8489 "): 12 leases with 3 customers

- BoA account ending in -9659 ("BoA-9659"): 13 leases with 3 customers

- Regions Bank account ending in -1350 ("RB-1350"): 11 leases with 2 customers

- Regions Bank account ending in -2140 ("RB-2140"): 5 leases with 3 customers

- Regions Bank account ending in -2159 ("RB-2159"): 7 leases with 4 customers

110. Upon information and belief, at least some of the proceeds from the RICO Enterprise's illegal acts are in one or more of the Suspected Enterprise Accounts.

111. **<u>Victim Accounts (5 bank accounts)</u>:** These are five bank accounts that TimePayment was able to link, through canceled checks, to one of the Lessees listed on a lease originated by Advanced. However, as part of their illegal acts, Isla drafted and Advanced submitted Lease Applications listing these accounts as the payment source for businesses other than the business that owned these accounts. The Victim Accounts include:

- JP Morgan Chase account ending in -5879 ("JP-5879"): 4 leases with 2 customers

- TD Bank account ending in -0275 ("TD-0275"): 3 leases with 2 customers

- TD Bank account ending in -2343 ("TD-2343"): 2 leases with 2 customers

- Truist account ending in -6843 ("Truist-6843"): 2 leases with 2 customers

- BoA account ending in -7205 ("BoA-7205"): 5 leases with 2 customers

112. In summary, the RICO Enterprise used the Islands Accounts, Suspected Enterprise Accounts, and the Victim Accounts to create a tangled web of payment sources spread across hundreds of leases and dozens of unrelated Lessees.

113. The point was to maximize the number of leases to and equipment payments from TimePayment while minimizing the risk that someone would uncover the fraud.

114. When it became tenable to do so, the RICO Enterprise took a greater level of control by listing its own accounts as the payment source on the fraudulent leases Advanced submitted to TimePayment. The small monthly lease payments were a small price to pay for mitigating the risk that some Advanced customers whose account was listed on a fraudulent lease would uncover the fraud and complain.

22

115.    But even if they did, the RICO Enterprise used Island Enterprises' accounts, and potentially others, to silence the customers by making hush payments through the bank-to-bank transfer app Zelle to cover whatever TimePayment removed from their accounts.

116.    This evolving criminal scheme worked long enough to allow Advanced to extract at least $2,138,701.00 in equipment payments from TimePayment on at least 314 fraudulent leases.

### THE PREDICATE ACTS SUPPORTING THE RICO ENTERPRISE

117.    The RICO Enterprise engaged in and profited from the following illegal predicate acts under Federal law and Florida law.

### PREDICATE ACTS UNDER FEDERAL LAW

118.    **Mail Fraud (18 U.S.C. § 1341):** Isla and Advanced knowingly submitted to TimePayment leases which were procured by fraud or misrepresentations, contained false information, or were forged. It did so to obtain equipment payments from TimePayment on false pretenses.

119.    They aimed to defraud TimePayment and succeeded in many instances. Indeed, TimePayment's investigation has uncovered well over 180 leases that fall into this category of fraud.

120.    Isla and Advanced used interstate mail to transmit those fraudulent lease applications and leases across state lines to TimePayment in Massachusetts.

121.    TimePayment has identified at least 241 Advanced-originated leases for which the Lessee never received the equipment subject to the lease or received different equipment than the equipment listed on the lease.

122.    Isla and Advanced also used interstate mail to transmit the invoices for the equipment subject to those leases to TimePayment.

123.    The false information contained in the lease applications, leases, and equipment invoices was clearly material to TimePayment's decision to approve the leases and render the equipment payments to Advanced.

124.    **Wire Fraud (18 U.S.C. § 1343):** The RICO Enterprise committed wire fraud by using interstate wires to facilitate and conceal its fraudulent scheme.

125.    Advanced received at least $2.5 million in equipment payments in Florida from TimePayment in Massachusetts, by interstate wires between November 2022 and May 2024.

126.    At least $2,138,701.00 of those payments were tied to 314 fraudulent leases that Advanced submitted to TimePayment. Those payments were procured by the acts of mail fraud described above.

127.    Upon information and belief, Isla directed Advanced to send some or all of those illegally obtained funds to Islands Enterprises, and potentially other related entities, by interstate wires.

128.    Upon information and belief, Islands Enterprises received the ill-gotten funds as part of a common scheme to hide the funds from TimePayment or others who may seek to recover them.

129.    At Isla's direction, Islands Enterprises used interstate wires to transfer funds to victims of the scheme who raised concerns to Isla. It did so to mollify those victims and keep them from complaining to TimePayment or legal authorities about the fraud.

130.    Indeed, one customer from Brooklyn, New York, told TimePayment that he had complained to Isla when he discovered that Advanced had bound him to a lease with TimePayment. Isla began sending the customer monthly Zelle payments (across state lines) to cover the monthly lease payments—ostensibly to keep the customer from complaining.

24

131.    Upon information and belief, some or all of the funds Islands Enterprises used to make these and other hush payments were those Advanced received from TimePayment and transferred to Islands Enterprises.

132.    In short, Islands Enterprises used interstate wires and illegally obtained funds to cover up and continue the RICO Enterprise's illegal activities.

133.    **Money Laundering (18 U.S.C. § 1956):** The RICO Enterprise also committed money laundering in furtherance of and to conceal the leasing scheme.

134.    First, upon information and belief, Isla directed Advanced to transfer some or all of the ill-gotten proceeds of its illegal activity to Islands Enterprises—an entity about which TimePayment was unaware at the time.

135.    Isla did this to conceal the funds from TimePayment and others and to continue the leasing scheme.

136.    Second, upon information and belief, the RICO Enterprise used the proceeds of its illicit acts to pay off victims of the scheme in the hope of keeping them quiet and allowing the scheme to continue unabated. It made some or all of these payments through Zelle transfers from Islands Enterprises and potentially other entities' accounts.

137.    Third, upon information and belief, the RICO Enterprise filled the Islands Accounts with the proceeds of the RICO Enterprise's illegal acts, listed them as payment sources on fraudulent leases, and then used those funds to cover lease payments, as alleged above.

138.    Upon information and belief, the RICO Enterprise shifted from listing third party bank accounts (such as the Victim Accounts) to the Islands Accounts to reduce the risk of fraud complaints and with the intent to carry on with the unlawful leasing scheme.

PREDICATE ACTS UNDER FLORIDA LAW

139.    **Violations of the Florida Communications Fraud Act (Fla. Stat. § 817.034):**
The RICO Enterprise also violated the Florida Communications Fraud Act ("FCFA") in
connection with the leasing scheme.

140.    The RICO Enterprise aimed to defraud TimePayment by obtaining TimePayment's
leasing services through fraudulent communications.

141.    Isla and Advanced knowingly transmitted false "writings" in the form of fraudulent
leases and invoices for the equipment subject to those fraudulent leases. *See* Fla. Stat., §
817.034(3)(a) (defining communications subject to the Act).

142.    Isla and Advanced sought to obtain TimePayment's leasing "services" through
these false communications and did so on at least 314 occasions between November 2022 and May
2024. *Id*., at § 817.034(3) (defining "services" as a form of "property" a defendant might seek to
"obtain" through a "scheme to defraud").

143.    These actions were part of a "scheme to defraud" in that it sought to—and did—
obtain TimePayment's leasing services through "false or false pretenses, representations,
endorsements of nonconsenting parties [i.e., the Lessee's], [and] promises or willful
misrepresentations of a future act." *Id*., at § 817.034(d) (bracketed language added).

144.    **Criminal use of personal identification information (Fla. Stat. § 817.568):** The
RICO Enterprise also violated a Florida statute prohibiting the criminal use of personal
identification information in perpetrating the leasing scheme.

145.    Section 817.568 of the Florida Statutes criminalizes any person's willful and
fraudulent use of "personal identification information," including a bank account number, "without
authorization" and "without first obtaining that person's consent." *See* Fla. Stat., § 817.568(2)(a);

26

*id.*, at § 817.568(f)(1) (defining "personal identification information" to include a "bank account number."

146.    As alleged above, Isla and Advanced repeatedly used businesses' bank account numbers to submit fraudulent leases for those businesses or for other unrelated businesses. These included, but are not limited to, the Victim Accounts identified above.

147.    In some instances, Isla and Advanced lacked a business' consent to submit multiple leases on its behalf.

148.    On other occasions, Isla and Advanced submitted one business' bank account (without that business' consent) as the payment source on leases for other businesses.

149.    In either event, Isla and Advanced used these businesses' bank account numbers in a fraudulent and unauthorized manner.

150.    **Misleading solicitations for payment (Fla. Stat. § 817.061):** The RICO Enterprise also violated the Florida statute prohibiting misleading invoice solicitations for payment.

151.    Section 817.061 of the Florida Statutes makes it unlawful for any person to "solicit payment of money by another by means of a statement or invoice . . . for goods not yet ordered or for services not yet performed and not yet ordered[.]" Fla. Stat. § 817.061(1).

152.    As alleged above, Advanced submitted numerous invoices for payment to TimePayment for equipment that it never delivered to the Lessee. On some occasions, Advanced delivered no equipment at all. On others, it delivered certain equipment to the Lessee (*e.g.*, equipment such as ATMs that was not on TimePayment's list of approved equipment), but billed TimePayment for different equipment (*e.g.*, equipment on TimePayment's approved list).

27

153.    In all, TimePayment has identified 241 Advanced-originated leases in which the Lessee never received the equipment subject to the Lease or received different equipment than the equipment listed on the lease.

154.    **<u>Violations of the Florida Money Laundering Act (Fla. Stat. § 896.101):</u>** The members of the RICO Enterprise also engaged in at least two distinct violations of the Florida Money Laundering Act ("MLA").

155.    As alleged above and in more detail below, the members of the RICO Enterprise knew that they procured at least $2,138,701.00 in payments from TimePayment for at least 314 fraudulent leases.

156.    Though they knew that these proceeds were the result of their illegal acts of mail fraud, wire fraud, and the other illegal activities described above, the members of the RICO Enterprise conducted financial transactions with those illegal proceeds.

157.    Upon information and belief, the members of the RICO Enterprise knowingly wired the illegal proceeds to various bank accounts associated with Islands Enterprises, with the intent of concealing or disguising the location of the funds of their unlawful activity, in violation of Fla. Stat. § 896.101(3)(a)(2)(a).

158.    Upon information and belief, the members of the RICO Enterprise also used those funds derived to make hush payments to victims of their illegal acts. They did so to prevent those Lessees from raising complaints about the fraud and to continue their illegal actions unabated. This violated Fla. Stat. § 896.101(3)(a)(1) as well.

159.    The RICO Enterprise committed these illegal predicate acts (state and federal) between November 2022 and at least May 2024, and in furtherance of the RICO Enterprise's common (illegal) goals.

## THE RESULTS OF THE RICO ENTERPRISE

160.    Between November 2022 and May 2024, Advanced originated 392 leases with 190 customers.

161.    To date, TimePayment has paid Advanced at least $2.5 million in connection with those leases.

162.    As of the date of this Complaint, TimePayment has discovered that 314 of those 392 leases (80%) were procured by fraud. Those leases are tied to over 100 victims across 9 states.

163.    TimePayment paid Advanced at least $2,138,701.00 for the equipment subject to those 314 fraudulent leases.

164.    As of February 28, 2025, 71% of the leases originated by Advanced are 30 days past due or more—significantly higher than TimePayment's average delinquency rate of 15%.

165.    TimePayment has already charged-off 65 leases, resulting in a loss of $266,229.00 in expected future lease payments.

### COUNT I
### Violation of 18 U.S.C. § 1962(c)
### (Against Isla, Advanced, and Islands Enterprises)

166.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

167.    The RICO Enterprise consists of Isla, Advanced, and Islands Enterprises.

168.    The members of the RICO Enterprise are distinct from one another, but associated to carry out a common goals of : (1) acquiring customers' personal and bank account information through fraud and misrepresentations; (2) submitting fraudulent leases to TimePayment; (3) maximizing the equipment payments from TimePayment through the fraudulent leases; (4)

concealing the RICO Enterprise's illegal acts and illicit profits through the bank account shell game; and (5) silencing victims through hush money payments.

169. As set forth above, the RICO Enterprise achieved these goals through a pattern of mail fraud, wire fraud, and money laundering (in violation of 18 U.S.C. §§ 1341, 1343, and 1956, respectively) between November 2022 and at least May 2024, if not longer.

170. Each of the members of the RICO Enterprise participated in its illegal activities as alleged above.

171. All of the members of the RICO Enterprise violated 18 U.S.C. § 1962(c), by engaging in the aforementioned pattern of racketeering activity.

172. This pattern of racketeering activity occurred in and affected interstate commerce.

173. First, the customers victimized by the RICO Enterprise resided in Delaware, Florida, Indiana, Massachusetts, Maryland, New Jersey, New York, Ohio, and Pennsylvania.

174. Second, the RICO Enterprise transmitted fraudulent and/or forged lease applications, leases, and equipment invoices through interstate mail to TimePayment in Massachusetts.

175. Third, the RICO Enterprise received its illicit profits, procured by the mail fraud described above, through interstate wires from TimePayment in Massachusetts.

176. Fourth, upon information and belief, the RICO Enterprise made one or more interstate wire transfers of hush money using the illegal proceeds and with the intent of continuing the Enterprise's illegal activities.

177. Finally, the RICO Enterprise's illegal actions caused, and are continuing to cause, harm to TimePayment in Massachusetts.

178.   Isla, Advanced, and Islands Enterprises collected illicit income and profits from their pattern of racketeering activity. They used those profits to enrich Isla and the entities, re-invest in the entities perpetrating the scheme, and pay off victims of the scheme to prevent its discovery.

179.   TimePayment suffered direct and proximate harm from the RICO Enterprise's acts and the violations of 18 U.S.C. § 1962(c) alleged above.

180.   Specifically, in reliance on Advanced's misrepresentations in the lease applications, TimePayment has paid Advanced over $2.5 million for the 392 leases Advanced originated between November 2022 and May 2024.

181.   Of the 392 leases Advanced originated, 320 remain active. As of February 28, 2025, 71% of those Leases are 30 days or more past due or more.

182.   Prior to filing this Complaint, TimePayment was forced to charge off 72 leases, resulting in a loss of $266,229.00.

183.   TimePayment has concluded that 314 of the 392 leases originated by Advanced—representing at least $2,138,701.00 in payments from TimePayment to Advanced for the equipment subject to those leases—are fraudulent.

184.   TimePayment has suffered at least $2,138,701.00 in damages from the RICO violations described above.

WHEREFORE, TimePayment requests that this Court enter judgment against Isla, Advanced, and Islands Enterprises for damages of not less than $2,138,701.00, treble damages of not less than $6,416,103.00, and attorney's fees, pursuant to 18 U.S.C. § 1964(c).

### COUNT II
### Violation of 18 U.S.C. § 1962(d)
### (Against Isla, Advanced, and Islands Enterprises)

185.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

186.    The members of the RICO Enterprise combined to accomplish the common goals alleged above through the pattern of racketeering activity identified above.

187.    As alleged above, the members of the RICO Enterprise engaged in that pattern of racketeering activity between November 2022 and at least May 2024, through the predicate acts of mail fraud, wire fraud, and money laundering.

188.    Each of the members of the RICO Enterprise knew that their predicate acts were an essential part of the racketeering activity supporting their common leasing scheme.

189.    Each of the members of the RICO Enterprise agreed to commission those predicate acts to further the common aims of their leasing scheme.

190.     Accordingly, the members of the RICO Enterprise violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

191.    As set forth in detail above, TimePayment suffered direct and proximate harm to its business as a result of the RICO Enterprise's overt acts in support of the conspiracy.

WHEREFORE, TimePayment requests that this Court enter judgment against Isla, Advanced, and Islands Enterprises (the members of the § 1962(d) conspiracy) for damages of not less than $2,138,701.00, treble damages of not less than $6,416,103.00, and attorney's fees, pursuant to 18 U.S.C. § 1964(c).

<u>**COUNT III**</u>
**Violation of Fla. Stat. §§ 772.103(3), 895.03(3)**
**(Against Isla, Advanced, and Islands Enterprises)**

192.   TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

193.   Isla, Advanced, and Islands Enterprises constitute an "enterprise" under the Florida RICO Act. *See* Fla. Stat. § 895.02(5).

194.   As alleged above, the Defendants formed the RICO Enterprise and executed the leasing scheme through a pattern of racketeering activity under the federal RICO Act. Those same activities also qualified as "racketeering activity" under the Florida RICO Act (Fla. Stat. § 895, *et seq*.), which affords victims a private right of action under Fla. Stat. § 895.05.

195.   As alleged above, the RICO Enterprise committed racketeering activity under the Florida RICO Act.

196.   It violated the FCFA through the submission of false lease applications and false invoices to TimePayment. *See* Fla. Stat. § 817.034.

197.   It engaged in criminal use of personal identification information by willful and fraudulent use of Lessee's bank account numbers by submitting those account numbers on multiple (unauthorized) lease applications for the same Lessee or on (unauthorized) lease applications for other Lessees, in violation of Fla. Stat. § 817.568.

198.   It made misleading solicitations for payment by submitting invoices for payment to TimePayment for equipment Advanced never delivered to the Lessee or for different equipment than what Advanced delivered to the Lessee, in violation of Fla. Stat. § 817.061.

199. It executed financial transactions (i.e., wire transfers) using the proceeds of the Enterprise's illegal acts in order to conceal the location of those proceeds in violation of Fla. Stat. § 896.101(3)(a)(2)(a).

200. It executed other financial transactions (i.e., Zelle transfers) using the proceeds of Enterprise's illegal acts to silence the victims of those acts and to continue performing those acts unabated and undiscovered, in violation of Fla. Stat. § 896.101(3)(a)(1)).

201. All of these actions qualify as "racketeering activity" within the meaning of the Florida RICO Act. *Id*., § 895.02(8)(a) (including a list of qualifying statutory crimes).

202. These actions constituted a "pattern of racketeering activity" under the Florida RICO Act because they consisted of two or more incidents of racketeering conduct with similar intent (perpetrating or covering up the leasing scheme), similar victims (TimePayment and the Lessees), and similar methods of commission (described above).

203. All of these incidents occurred between November 2022 and the present and thus, within five (5) years of one another. Accordingly, they constitute a "pattern of racketeering activity" within the meaning of Fla. Stat. § 895.02(7).

204. By engaging in this pattern of racketeering activity as part of their roles in the RICO Enterprise, each of the Defendants violated Section 895.03(3) of the Florida RICO Act.

205. As detailed above, TimePayment has suffered damage to its business as a result of Defendants' pattern of racketeering activity.

WHEREFORE, TimePayment seek a temporary restraining order, a preliminary injunction, and a permanent injunction, pursuant to Fla. Stat. § 895.03(1)(a), and (6), as well as disgorgement of the Defendants' ill-gotten proceeds from the pattern of racketeering activity described above.

## COUNT IV
### Violation of Fla. Stat. §§ 772.103(4), 895.03(4)
### (Against Isla, Advanced, and Islands Enterprises)

206.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

207.    Isla, Advanced, and Islands Enterprises constitute an "enterprise" under the Florida RICO Act. *See* Fla. Stat. § 895.02(5).

208.    The members of the RICO Enterprise committed the predicate pattern of racketeering activity under the Florida RICO Act—violations of Florida Statutes §§ 817.034, 817.061, 817.568, 896.101(3)(a)(2)(a), and 896.101(3)(a)(1)—in the manner described above. Each member's specific role and predicate acts in the leasing scheme are set forth in detail above and incorporated as if set forth fully here.

209.    Each of the members of the RICO Enterprise knew that their predicate acts were an essential part of the racketeering activity supporting the common illegal goals of the Enterprise (described above).

210.    Each of the members of the RICO Enterprise agreed to commission those predicate acts to further the Enterprise's common aims (alleged above).

211.    Accordingly, the members of the RICO Enterprise violated Fla. Stat. § 895.03(4).

212.    As set forth in detail above, TimePayment suffered direct and proximate harm to its business as a result of the RICO Enterprise's overt acts in support of the conspiracy.

213.    As detailed above, TimePayment has suffered damage to its business as a result of Defendants' pattern of racketeering activity.

214.    WHEREFORE, TimePayment seek a temporary restraining order, a preliminary injunction, and a permanent injunction, pursuant to Fla. Stat. § 895.03(1)(a), and (6), as well as

disgorgement of the Defendants' ill-gotten proceeds from the pattern of racketeering activity described above.

## COUNT V
### Unjust Enrichment (in the Alternative)
### (Against Advanced)

215.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

216.    Between November 2022 and May 2024, TimePayment conferred a benefit on Advanced in the form of payments of at least $2.5 million, representing the cost of the equipment it purchased from Advanced and then leased to Advanced's customers.

217.    Advanced understood that TimePayment made these payments to Advanced based on the representations Advanced made in the lease materials and equipment invoices it submitted to TimePayment.

218.    Advanced further understood that TimePayment intended to collect monthly lease payments from Advanced's customers (i.e., Lessees).

219.    Advanced accepted the benefit of TimePayment's payments based on these understandings.

220.    Yet, Advanced knew that 314 of the leases it submitted to TimePayment, and many of the equipment invoices, were fraudulent.

221.    Some customers discovered the fraud and stopped paying TimePayment on their leases.

222.    Other Leases were tied to bank accounts that, by 2024, were registering insufficient funds.

223.     Advanced retained the benefit of TimePayment's payment for the Leases, while intentionally undermining the basis upon which TimePayment conferred that benefit and depriving TimePayment of the lease payments it expected to receive from the arrangement.

224.     TimePayment has determined that at least 314 of the leases originated by Advanced—representing at least $2,138,701.00 in equipment payments—are the product of fraud.

225.     Accordingly, it would be unjust to allow Advanced to retain the benefit of these payments and would only serve to reward it for its fraud.

WHEREFORE, TimePayment requests that this Court enter judgment against Advanced for not less than $2,138,701.00.

## **PRAYER FOR RELIEF**

WHEREFORE, TimePayment respectfully requests that the Court enter judgment against the Defendants as follows:

1.     An Order awarding TimePayment the value of the damages it suffered as a result of the Defendants' RICO violations of not less than $2,138,701.00, with the exact amount to be determined at trial;

2.     An Order awarding TimePayment the trebled amount of the damages it suffered as a result of the Defendants' RICO violations of not less than $6,416,103.00, with the exact amount to be determined at trial;

3.     A temporary restraining order, preliminary injunction, and permanent injunction under Florida Statutes § 895.05(1)(a) and (6);

4.     Disgorgement of the Defendants' ill-gotten gains from the RICO Enterprise;

5.     (In the alternative under Count V), an Order awarding TimePayment not less than

$2,138,701.00 from Advanced to prevent unjust enrichment, with the exact amount to be determined at trial;

6.       An Order awarding TimePayment its attorney's fees pursuant to 18 U.S.C. § 1964(c); and

7.       Any other legal or equitable relief that this Court deems just and proper.


Dated: March 24, 2025                    Respectfully submitted,

                                         TIMEPAYMENT CORP.

                                         By Counsel

                                         */s/ Joelle C. Sharman*
                                         Joelle C. Sharman (FL Bar. No. 45070)
                                         O'HAGAN MEYER
                                         3500 Lenox Road, Suite 1500
                                         Atlanta, Georgia 30326
                                         Telephone: (770) 891-0213
                                         Email: *JSharman@ohaganmeyer.com*

                                         Charles K. Seyfarth (*pro hac application
                                         forthcoming*)
                                         C. Quinn Adams (*pro hac application forthcoming*)
                                         O'HAGAN MEYER
                                         411 East Franklin Street, Suite 500
                                         Richmond, Virginia 23219
                                         Telephone: (804) 403-7137
                                         Email: CSeyfarth@ohaganmeyer.com
                                         Email: CAdams@ohaganmeyer.com

                                         *Counsel for TimePayment Corp.*

## **VERIFICATION**

I, Filippo Guidi, am the Chief Financial Officer at TimePayment Corp. I have first-hand

knowledge of many of the facts alleged in the Verified Complaint and have reviewed that document

in its entirety. I declare under penalty of perjury that the Verified Complaint is true to the best of

my knowledge, information, and belief.


March 24, 2025

Filippo Guidi
CFO, TimePayment Corp.